Greg FENNELL, Plaintiff,

v.

George SIMMONS, et al., Defendants.

No. 1:96CV0800.

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 3, 1997.

George W. MacDonald, Cleveland, OH, for plaintiff.

Andrew Michael Wargo, Cleveland, OH, for defendants.

## MEMORANDUM OPINION AND ORDER

PERELMAN, United States Magistrate Judge.

This action was brought by Plaintiff, a paraplegic confined to a wheelchair, against the Sheriff of Geauga County, George Simmons, and the Geauga County Commissioners, Neal Hofstetter, William Repke and Jan Novak, based upon alleged violation of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.* (hereinafter ADA).[1] The motion now before this Court presents the discreet question whether the ADA applies to a county jail.[2]

The core of plaintiff's claim for relief is found in the following paragraphs of the complaint:

8. On June 12, 1995, by Order of the Chardon Municipal Court in Chardon, Ohio, Plaintiff was ordered into incarceration in the custody of the Geauga County Sheriff's Department under the direction of Defendant George Simmons, the elected county sheriff.

---

1. Although the complaint also alleges violation of 42 U.S.C. § 1983 it is clear that such claim is derivative of the statutory ADA claim and is not based upon alleged violation of any other constitutional right.

2. Defendants' motion challenges the general application of the ADA to all prisons and jails, rather than focusing upon the statute's application to the specific facts alleged in the complaint, it being argued that the complaint fails to state a claim upon which relief can be granted by reason of the inapplicability of the ADA to a jail or prison. Therefore, although captioned as a motion for summary judgment it may properly be considered as a Rule 12(a) motion for judgment on the pleadings.

9. Despite being aware that the Geauga County jail was not suited for more than an overnight stay, if that, by a paraplegic, and that it was not suitable for the health and well-being of Plaintiff herein, Defendant, thru persons employed by him and under his direction and control, received said Plaintiff into custody and placed him in the Geauga County Jail for confinement and incarceration from June 12, 1995 thru June 27, 1995.[3]

10. During the time in which Plaintiff was incarcerated in the Geauga County Jail, the following, without limitation, occurred to him: he spent the first 48 hours in a wheel chair, unable to lie down or use toilet facilities; was placed on a toilet which was defective so that the riser on it fell, causing both injury and discomfort to Plaintiff; was unable to shower until on or after June 19, a full week after his incarceration; was required after such date to wear socks and shoes in the shower; was placed in a bed in which he was unable to be properly turned so that he developed serious and long persisting bed sores; and was denied medical care for said sores; and was in general the subject of both physical and medical neglect.

Section 12132 of Title 42 provides:

Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

"Public entity" is broadly defined in § 12131(1)(B) as including "any department, agency, special purpose district, or other instrumentality of a State or States local government." The term "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). For interpretative purposes the proscriptions of the ADA parallel those of the substantially similar Rehabilitation Act (hereinafter Rehab Act), 29 U.S.C. § 794.[4]

Although the statutory language could be construed as reflecting absolutes, with no escape hatches or safe havens, the regulations adopted pursuant thereto reflect that, as is true with the Rehab Act, *see Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), a standard of reasonableness prevails. 28 C.F.R. § 35.150 in pertinent part provides:

(a) *General.* A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities.

\* \* \* \* \* \*

(3) Require a public entity to take any action that it can demonstrate would

---

3. In Defendant's brief it is stated that "On June 12, 1995, due to a violation of his parole, the Chardon Municipal Court ordered Plaintiff to be held without bond in the Geauga County Jail." Plaintiff's brief in turn does not state why he was confined but does state that his conviction was of a misdemeanor, for which the penalty was "six months or less of incarceration in a county municipal facility," with no loss of any rights or privileges of citizenship. As neither of these representations is reflected in the complaint or supported by affidavit this Court cannot give them any credence.

4. In signing the ADA into law President Bush discussed fears that the bill was vague and costly, stating in that regard "The Administration worked closely with the Congress to ensure that, wherever possible, existing language and standards from the Rehabilitation Act were incorporated into the ADA. The Rehabilitation Act standards are already familiar to large segments of the private sector that are either federal contractors or recipients of Federal funds." Statement by President of the United States, 26 Weekly Comp.Pres.Doc. 1165 (July 30, 1990).

result in a fundamental alteration in the nature of a service, program or activity or in undue financial and administrative burdens....[5]

When this court first considered the question of the applicability of the ADA to a county jail the answer appeared to be simple and straightforward, dictated by the rules of statutory construction that a court must first look to the plain language of a statute for guidance, *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993), and that such language is controlling except in those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters ... or when the language is ambiguous." *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 842 (6th Cir.1994). The syllogism which follows from this is:

1) A county, such as Geauga County is a local government, so as to constitute a "public entity" within the meaning of Section 12132.

2) Administration of a county jail is one or all of a service, program or activity (albeit often an unwelcome one to those confined therein) provided by county government, within the sense of Section 12132.

3) Therefore, the protection afforded by Section 12132 to a disabled individual against exclusion from participation in or denial of the benefits of a service, program or activity of a public entity, or to acts of discrimination by such public entity extends to an individual confined in a county jail.[6]

Although this Court perceives no ambiguity in the statute, the legislative history was examined to ascertain whether there is a direct expression of Congressional intent contrary to this Court's interpretation. While none was found, this Court did come across the following in the House Reports which this Court considers to be consistent with this Court's interpretation:

> In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid for seizures. Often, after being arrested, they are deprived of medications while in jail, resulting in further seizures. Such discriminatory treatment based on disability can be avoided by proper training.

H.R.Rep. No 101–485(III), at 50, *reprinted in* 1990 U.S.C.C.A.N. 267, 473.

Recognizing that in law, as in life, matters are at times not as simple as they may seem, this Court also undertook comprehensive research into precedents under the ADA and Rehab Act in the context of prisons and jails to determine how other courts had dealt with this issue.

What this Court discovered is that with but a few exceptions all of those decisions shared two common factors rendering them of little guidance in this action, those being that (1) The institutions involved were state penitentiaries and the plaintiffs were convicted felons serving sentences therein and (2) The threshold issue of the applicability of the ADA and/or Rehab Act was apparently not raised/considered and decision turned upon other issues of law and/or fact. *See Duffy v. Riveland*, 98 F.3d 447 (9th Cir.1996); *Wagner v. Jett*, 1994 WL 532930 (6th Cir.1994); *Lue v. Moore*, 43 F.3d 1203 (8th Cir.1994); *Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994); *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir.1991); *Williams v. Meese*, 926 F.2d 994 (10th Cir.1991); *Niece v. Fitzner*, 922 F.Supp. 1208 (E.D.Mich.1996); *Clarkson v.*

---

**5.** The regulation places the burden of proof in such regards upon the public entity.

**6.** This is the only point of law at issue under defendant's motion. Whether the conduct alleged by plaintiff in fact arises to the level of exclusion or denial or whether it amounts to discrimination within the purview of the statute is not now before this Court. Similarly, whether the defendant might be excused from compliance with the ADA, in whole or in part, because of the alterations which might be required or the burdens which might be imposed is not now before this Court.

*Coughlin,* 898 F.Supp. 1019 (S.D.N.Y.1995); *Timmons v. New York State Department of Correctional Services,* 887 F.Supp. 576 (S.D.N.Y.1995); *Noland v. Wheatley,* 835 F.Supp. 476 (N.D.Ind.1993); *Casey v. Lewis,* 834 F.Supp. 1569 (D.Az.1993); *Donnell v. Illinois State Board of Education,* 829 F.Supp. 1016 (N.D.Ill.1993); *Sites v. McKenzie,* 423 F.Supp. 1190 (N.D.W.Va.1976).

In many of those cases the plaintiff's claim[s] foundered on the shoals of qualified immunity. Therefore, it could be said that in light of the decision in *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) those rulings represent a tacit recognition that the ADA or Rehab Act is applicable to prisons and jails.

In *Siegert* the court of appeals had assumed for the sake of decision that the plaintiff had stated a claim for violation of a constitutional right and found the defendant entitled to qualified immunity on the basis that such right was not clearly established. The Supreme Court criticized that approach, stating:

> We think the Court of Appeals should not have assumed without deciding, this preliminary issue in this case, nor proceeded to examine the sufficiency of the allegations of malice.
>
> .....A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

*Id.* at 232, 111 S.Ct. at 1793.

The approach of assuming a violation as the predicate for a qualified immunity analysis is also contrary to the following rules concerning adjudication of the defense of qualified immunity as set forth in the very recent Sixth Circuit decision in *Dickerson v. McClellan,* 101 F.3d 1151 (6th Cir.1996).

> The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred. *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 589 (6th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994); *Silver v. Franklin Township,* 966 F.2d 1031, 1035 (6th Cir.1992). If we find a constitutional violation, we examine whether it involved "clearly established constitutional rights of which a reasonable person would have known." *Christophel [v. Kukulinsky],* 61 F.3d [479] at 484 [ (6th Cir.1995) ] (citation omitted). In determining whether a constitutional right is "clearly established" at the time of the actions in question we "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Buckner v. Kilgore,* 36 F.3d 536, 539 (6th Cir.1994) (citation omitted). The standard for qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)). Therefore, for a plaintiff to make a successful § 1983 claim, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo,* 953 F.2d at 1042. "Although it need not be the case that 'the very action in question has previously been held unlawful, ... in the light of pre-existing law the unlawfulness must be apparent.' "
>
> Once it is determined that the right is clearly established, the court must determine "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994). Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights. *Buckner,* 36 F.3d at 540.

101 F.3d at 1157–58.

There is a very cogent jurisprudential consideration underlying the rule calling for initial consideration of the question whether a constitutional violation has been alleged. So

long as courts persist in adjudicating constitutional claims by moving directly to the question of qualified immunity and rejecting the plaintiff's claim on the basis that the constitutional right alleged to have been violated was not clearly established, without first considering whether there was a viable claim of violation of that constitutional right, it is doubtful that the constitutional right at issue could ever become clearly established, plainly a Catch–22 proposition.

Three circuits have rendered decisions in which the question of the applicability of the ADA and/or Rehab Act to places of confinement was spoken to, although each of those was in the context of a convicted felon in a state penal institution.

The first was the Ninth Circuit, which in *Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988) flatly rejected the argument that the Rehab Act does not apply to an inmate in a state prison. In so doing that court found no merit in the contention that "it is unlikely that Congress ever intended that Section 504 apply to prisoners," finding that the statutory language, which parallels that of the ADA, was plain, further noting that "By ensuring that inmates have meaningful access to prison activities, such as disciplinary proceedings and counseling, the goals of both the institution and the Rehabilitation Act are served." *Id.*, at 562.

The Ninth Circuit reiterated this general proposition in *Gates v. Rowland*, 39 F.3d 1439, 1446–47 (9th Cir.1994), in which the court cited *Bonner* as representing the Ninth Circuit's position that the Rehab Act applies to prisons receiving federal financial assistance. The court then went on to address the proper application of that Act taking into consideration the "reasonable requirements of effective prison administration," holding that a prisoner's rights pursuant to the Act could be circumscribed by "legitimate penological interests."

Although some courts have suggested that this represents a retreat from the *Bonner* decision as to the basic applicability of the Rehab Act to state prisons, *see, e.g. Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), it is the opinion of this Court that such is not the case. That the holding in *Bonner* was not disturbed, but, rather, reinforced by *Gates* is confirmed by the Ninth Circuit's later decision in *Duffy v. Riveland*, 98 F.3d 447 (9th Cir.1996), in which the propriety of the application of the ADA to a prison setting was assumed.

In 1995 the Fourth Circuit handed down its decision in *Torcasio, supra,* in which an inmate in a state prison brought suit advancing claims for recovery under both the ADA and the Rehab Acts. The district court held as a general proposition that both Acts applied to such an action, and proceeded to uphold in part and reject in part (on a claim specific basis) the defense of qualified immunity. Some of the plaintiff's claims were dismissed based upon findings that the constitutional rights which the plaintiff alleged had been infringed were not clearly established. Others failed upon findings that the plaintiff's rights had not been violated by the conduct in question. The trial court, however, also ruled that other claims were actionable under the ADA and/or Rehab Act. The circuit court held that all of the plaintiff's claims failed for the reason that "it was not clearly established at that time that the ADA and Rehabilitation Act—the two acts upon which Torcasio's claim of a right to modification of services and facilities is predicated—applied to state prisons." *Id.* at 1343.

Although this Court could distinguish *Torcasio* on the basis that it turned upon a finding of qualified immunity rather than directly addressing the question of the applicability of the ADA and/or Rehab Act to a prison setting, to do so would be to ignore the reality of the extended explication by the Fourth Circuit, dictum though it may be, as to why those acts should not be deemed applicable to state prisons (and those confined therein). That court began its analysis in such regard with a discussion of what it considered to be the "facial ambiguity of the legislation," stating "[w]e are not persuaded that this language, however, even viewed in isolation from the arguably narrowing text found elsewhere in the acts, brings state prisons 'squarely' within the reach of these acts." *Id.* at 1344. Proceeding from that premise that court then reviewed a series of Supreme Court holdings in a variety of pris-

on civil rights actions which recognized the need of prison authorities to exercise discretionary authority in order to maintain order and discipline in their institutions, concluding that those rulings stand for the proposition that Congress is, or should be, so loath to interfere with the running of state prisons that only a clear mandate by Congress would permit application of legislation such as the ADA and/or Rehab Act to such a setting. Failing to find that clear mandate in the statutes the court expressed the opinion that the statutes should not be deemed applicable to the plaintiff's claims, although only squarely holding that such applicability was not clearly established,[7] so as to entitle the defendants to judgment on all of Torcasio's claims of relief on the basis of qualified immunity.

The year following the *Torcasio* decision the Seventh Circuit almost joined forces with the Fourth in *Bryant v. Madigan,* 84 F.3d 246 (7th Cir.1996). This Court's use of the word "almost" is in recognition of the fact that in *Bryant* the court disavowed deciding the precise question of the applicability of the ADA to a state prison,[8] while expressing jurisprudential/philosophical observations akin to some contained in *Torcasio.*

This Court's research has revealed only two decisions, both at the district court level, in which the question of the applicability of the ADA to other than a state penal institution has been squarely faced, and those courts reached opposite conclusions.

In *Outlaw v. City of Dothan,* 1993 WL 735802 (M.D.Ala.) the court held the ADA applicable in an action brought by a disabled individual[9] serving a twelve-day sentence upon a DUI conviction in the Dothan Munici-

pal Jail. As this Court believes is correct, that court rejected the contention that operation of the jail was not a service, program or activity of a public entity, holding that "under common usage and understanding of the terms the jail and all of its facilities, including the shower, constitutes a service, program or activity of the City of Dothan to which the ADA applies." Slip opinion at p. 4.

In *Little v. Lycoming County,* 912 F.Supp. 809 (M.D.Pa.1996) the court held "The Fourth Circuit's well reasoned approach [in *Torcasio* ] is, we conclude, the correct interpretation. The ADA should not be held applicable to facilities provided for prisoners in state prisons in the absence of a clear expression of congressional intent that that be the case, and we are not convinced that such intent has been expressed." *Id.* at 809. This Court is constrained to observe that while the foregoing refers to "facilities provided for prisoners in state prisons," the plaintiff in that case was seeking redress under the ADA for events which occurred while she was confined for a little more than three months in the Lycoming County Prison,[10] which it must be presumed was a function of county government in light of the fact that Lycoming County was the primary defendant.

This Court is also at a loss to understand the citation in *Little* to the holding in *Crowder v. True,* 1993 WL 532455 (N.D.Ill.1993) that the ADA does not apply to the Federal Bureau of Prisons as support for the conclusion that the Act does not apply to a non-federal institution. The fact that the Federal Bureau of Prisons is explicitly excluded from the operation of the ADA in that legislation does not, in this Court's opinion, reflect that

---

**7.** The court considered the *Bonner* decision as the only relevant precedent.

**8.** In part the opinion states "Even if such persons are protected, however, which we need not decide (for Congress may not have wanted to burden the states with the potentially enormous costs of making their prisons fully accessible to disabled visitors and employees)," *id* at 248, and "Even if there were (as we doubt) *some* domain of applicability of the Act to prisoners, the Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *id* at 249. Among the considerations mentioned in that ruling was that prison-

ers incarcerated on felony convictions suffer some losses of civil rights, a factor which would have no bearing in the case of a pretrial detainee or one convicted of a misdemeanor.

**9.** The plaintiff wore an artificial leg due to an injury suffered in a house explosion, and was required to take medication on a regular basis as a consequence of burns he sustained in that incident.

**10.** The opinion sheds no light upon whether that confinement was pre-trial or post-conviction.

arms of state government are entitled to a similar exclusion. Indeed, a cogent argument could be made that if Congress saw the need to specifically exempt the Federal Bureau of Prisons from the expansive language of the ADA the failure to provide a comparable exemption to non-federal facilities is implicitly reflective of legislative intent that they are included.

Having given the *Torcasio* decision extended consideration, this Court, for several reasons, is not swayed from the conclusion initially stated herein.

Of primary significance to this Court is that in *Torcasio* the court did not explicitly decide the threshold issue of the applicability of the ADA or the Rehab Act to a place of confinement. Instead, it specifically avoided that threshold issue, finding that even if these Acts applied to such setting that application was not clearly established at the time the action arose. In addition to this analysis being inappropriate in light of *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (*see fn # 7 supra* ), it avoids the very issue Defendants argue it resolves.

Furthermore, this court is unable to agree with the *Torcasio* court in its determination that the statutory language is unclear, so as to permit looking beyond the terms of the ADA to find its proper interpretation. In the opinion of this Court the language of 42 U.S.C. §§ 12131 and 12132 is not unclear or ambiguous. That the Supreme Court has held in other contexts that the administration of state prisons should be as autonomous as possible provides no indication that Congress intended to exclude state prisons from the reach of the ADA (and the limited legislative history on the subject suggests the opposite).

Exploration of the Supreme Court precedents constituting the foundation of the *Torcasio* opinion only serves to strengthen this Court's perception on this issue. In this Court's opinion, none of the Supreme Court precedents looked to by the Fourth Circuit in *Torcasio* mandate the conclusion reached therein. In *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) the

issue before the Supreme Court was the interplay between 28 U.S.C. § 2255, the habeas corpus statute, and 42 U.S.C. § 1983 as regards a convicted defendant's ability to challenge that conviction in a civil rights action. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) was an Eighth and Fourteenth Amendment attack upon double celling at a particular jail. The issue in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) was whether prison regulations restricting personal correspondence of inmates violated the First Amendment. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) in large part pertained to rights of pretrial detainees,[11] but it also turned upon First, Fourth, Fifth and Eighth Amendment considerations. It is plain from each of those decisions, as it is from constitutional jurisprudence in general, that when dealing with constitutional doctrines which have no precise boundaries a balance may be drawn between the constitutional right or privilege claimed by an individual and societal interests opposing those of the individual. Those considerations do not come into the picture when the issue is whether a statute by its very terms applies to a static factual predicate.

While this Court recognizes the very strong language in several Supreme Court decisions counseling the exercise of judicial restraint as regards interference by the federal courts in management of state prisons, this Court believes that one of the strongest of those expressions when considered in full context reflects that this Court's determination is not in conflict with the Supreme Court's guiding hand. In *Procunier* the Court stated:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature

---

11. Although not addressed at great length in that decision, it is clear that in *Bell* the Supreme Court recognized that pretrial detainees retain greater rights and are entitled to more protection than is true of sentenced prisoners.

of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.[12]

416 U.S. at 404, 405, 94 S.Ct. at 1807. Having so clearly and forcefully articulated the considerations militating against judicial intervention, the Supreme Court then stated:

> But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.... This is such a case.

*Id.* at 405, 94 S.Ct. at 1807–08.[13]

This Court has no hesitancy in paraphrasing the above by stating:

A policy of judicial restraint cannot encompass any failure to take cognizance of valid statutory claims whether arising in a federal or state institution. When a county jail regulation or practice offends a federal statutory mandate, federal courts will discharge their duty to enforce the mandate. This may be such a case.

Finally, this Court believes that the factors spoken to in *Torcasio* (and the authorities it drew upon) as warranting non-intervention in the affairs of state prisons do not necessarily apply with equal force in a case involving management of and/or conditions in a county or municipal jail, a facility designed primarily to house individuals charged with but not convicted of criminal offenses (often not at the felony level). This is not to say that those who bear the burden of administering the latter category of institutions do not have their own panoply of problems to solve and crosses to bear, only that it should be recognized that there may be differences between state and local facilities which could account for differing conclusions.

Before closing, this Court, in an abundance of caution and at the risk of repetitiveness, must make absolutely clear what is and is not implicated in this ruling. The only question of law presented by defendants' motion is does the ADA apply to a county jail, a question this Court answers in the affirmative. The motion does not seek judgment based on the contention that the facts alleged in the complaint are insufficient to state a claim for relief under the ADA, and this decision does not address that issue.[14] The motion does not seek judgment based on qualified immunity, and this decision does not address that issue. The motion does not, and could not, present the question whether defendants can establish that in order to satisfy whatever needs this plaintiff may have would result in a fundamental alteration in the nature of a

---

12. Although in *Torcasio* the court did not quote at length the above language in *Procunier* the court did cite to this portion of the Supreme Court decision in support of its position that the ADA and Rehab Acts should not be applied to prisons and jails.

13. Ultimately the court held that in several regards the prison policies under consideration could not withstand constitutional scrutiny and set them aside.

14. A claim for relief under the ADA requires proof of elements different from those which might underlie a claim for relief based upon negligence or medical malpractice.

service, program or activity or in undue financial and administrative burdens, and this decision does not address that proposition.

Defendants' motion, considered as a Rule 12(c) motion for judgment on the pleadings, is denied.

**IT IS SO ORDERED.**