Joyce D. LITTLE, Plaintiff,

v.

LYCOMING COUNTY, et al., Defendants.

Civ. No. 4: CV–95–399.

United States District Court,
M.D. Pennsylvania.

Jan. 18, 1996.

The Williamsport Hospital (the hospital), and various physicians who render care at the prison and are identified originally by plaintiff as Drs. John Doe #1, #2 and #3 and various nurses who render care at the same facility and are identified originally by plaintiff as "Nurse Elaine," "Nurse Denise" and "Nurse John Doe."

Plaintiff asserts claims under the Eighth Amendment to the United States Constitution and under the "Americans With Disabilities Act of 1990," (ADA) 42 U.S.C. §§ 12101–12134.

Certain counts of plaintiff's original complaint were dismissed, and plaintiff was granted leave to file an amended complaint. Plaintiff filed an amended complaint on May 22, 1995 in which she alleges the basis for her remaining claims asserted under the Eighth Amendment and the ADA.

Currently before the court are: 1) a motion by the county defendants to dismiss or in the alternative for summary judgment on plaintiff's claims (record document no. 8); 2) a motion by the hospital and other related defendants to dismiss or, in the alternative, for summary judgment in their favor (record document no. 12); and 3) plaintiff's motion urging the denial of defendants' pending motions and entry of judgment on the pleadings in her favor (record document no. 16).

For the reasons which follow, we will enter an order: 1) granting the motions of both sets of defendants for judgment in their favor; and 2) denying plaintiff's motion.

Joyce D. Little, pro se.

R. Matthew Patch, Sean P. Roman, McCormick, Reeder, Nichols, Bahl, Knecht & Person, Williamsport, PA, for defendants.

### MEMORANDUM

McCLURE, District Judge.

## BACKGROUND:

Plaintiff Joyce D. Little filed this section 1983[1] action against Lycoming County, Pennsylvania (the county), the Lycoming County Prison Board (the board), Lycoming County Prison Warden David A. Desmond,

## DISCUSSION

### Summary judgment standard

Defendants move, in the alternative, for dismissal of the complaint or for summary judgment in favor. As discussed below, defendants' motions can be decided based on the pleadings alone and plaintiff's complaint dismissed as untimely.

We do, however, for the sake of thoroughness and in the interest of allowing the *pro se* plaintiff every opportunity to litigate the merits of her case, consider plaintiff's claims

---

1. 42 U.S.C. § 1983.

on the merits on the basis of the record before us.

Plaintiff does not oppose the consideration of the pending motions as motions for summary judgment and has, in fact, filed her own affidavit [2] in opposition to the pending motions as well as her own motion for judgment on the pleadings in her favor. Further, given the nature of plaintiff's claims and the fact that her entire case rests essentially on her medical records while incarcerated, all of which have been produced by defendant and made a part of this record, it is not unjust to consider the pending motions as motions for summary judgment. See: Fed.R.Civ.P. 12(b)(6).

■ Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ...

that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 323 and 325, 106 S.Ct. at 2553 and 2554.

■ Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

### Statute of limitations

■ Claims arising under section 1983 are subject to a two-year statute of limitations. Any claims based on events which predate the filing date by more than two years are time-barred. Federal courts apply the state personal injury statute of limitations in section 1983 actions, *Wilson v. Garcia,* 471 U.S. 261, 276–80, 105 S.Ct. 1938, 1947–49, 85 L.Ed.2d 254 (1985). Pennsylvania's statute of limitations applies here, and under it, the time limit for filing a section 1983 claim is two years. *Smith v. City of Pittsburgh,* 764 F.2d 188, 194 (3d Cir.1985), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985) and 42 Pa.Cons.Stat.Ann. § 5524.

Plaintiff was incarcerated in the Lycoming County Prison from February 4, 1993 through May 7, 1993. The complaint was filed on March 16, 1995. All of plaintiff's allegations pre-date the filing of her complaint by more than two years. The last date on which she alleges the denial of adequate medical care is March 1, 1993.

■ No legitimate basis for tolling the statute of limitations with respect to plaintiff's Eighth Amendment claims for the denial of medical care has been alleged or is indicated in the record before us. Since all

**2.** Record document no. 20.

such claims predate the March 16, 1995 filing date by more than two years, they are time-barred and could be dismissed on that basis alone. We will, however, in light of plaintiff's *pro se* status, consider such claims on the merits.

Plaintiff's claims asserted under the ADA and her constitutional claim arising out of her alleged exposure to second-hand smoke are another matter. Such claims are arguably of a continuing nature and could reasonably be construed as having existed throughout plaintiff's term of incarceration. Those claims are, therefore, not time-barred.

### Section 1983 standards

To state a viable section 1983 claim, a plaintiff must allege that the conduct complained of was committed by a person acting under color of state law and that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or by laws of the United States. *Cohen v. City of Philadelphia*, 736 F.2d 81, 83 (3d Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). Private physicians or hospitals which provide medical services to inmates pursuant to a contract with the prison may be held liable in a civil rights suit. *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).

A defendant's conduct must have a close causal connection to plaintiff's injury for section 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). Negligent conduct is not actionable under section 1983. *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986) and *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986).

### Eighth Amendment standards

To state an Eighth Amendment claim for denial of medical care, the plaintiff must prove specific facts which show that the defendants exhibited a "deliberate indifference" to her serious medical needs.

The standard established by the United States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and its progeny has two prongs: 1) it requires deliberate indifference on the part of the prison officials and 2) it requires the prisoner's medical needs to be serious. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987) *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

Deliberate indifference is more than inadvertence or a good faith error; it is characterized by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Negligent misdiagnosis or an inadvertent failure to provide care does not establish a constitutional violation. *Estelle*, 429 U.S. 97, 104–106, 97 S.Ct. 285, 291–92 (1976). "The courts will not intervene upon allegation of mere negligence, mistake or difference of opinion ... For a constitutional tort to arise and for a cause of action to be stated under section 1983, the complainant must allege deliberate indifference to his continued health and well-being." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977). There must be proof that the conduct alleged was deliberate and intentional. *Hampton v. Holmesburg*, 546 F.2d 1077, 1081 (3d Cir.1976).

With regard to the deliberate indifference prong, " 'It is only such [deliberate] indifference' that can violate the Eighth Amendment; allegations of 'inadvertent failure to provide adequate medical care,' or of a 'negligent ... diagnos[is]' simply fail to establish the requisite culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991) (quoting *Estelle*, 429 U.S. 97, 97 S.Ct. 285 (1976) (Other citations omitted.).

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment ... which remains a question of sound professional judgment.' " *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979), quoting *Bowring*, 551 F.2d at 48. See also: *Ellison v. Scheipe*, 570 F.Supp. 1361,

1363 (E.D.Pa.1983) ("prison officials cannot be required to second guess the medical judgment of the physician.")

■ Along the same lines, evidence which shows only that an inmate disagrees with a diagnosis or the course of treatment selected for him are not sufficient. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92. "The key question ... is whether defendants have provided plaintiff with some type of treatment, regardless of whether it is what plaintiff desires." *Lamb v. Maschner*, 633 F.Supp. 351, 353 (D.Kan.1986). See also: *Tulibacki v. Prison Health Services*, 1995 WL 710595 at *1 (E.D.Pa. Nov. 29, 1995.).

### Alleged Eighth Amendment violations

■ Plaintiff's Eighth Amendment claims are based on the medical care which she allegedly received or failed to receive while incarcerated in the Lycoming County Prison.

Plaintiff alleges that she suffered from a number of maladies while incarcerated in the Lycoming County Prison, which were allowed to go untreated and were in some instances exacerbated by the conditions which she was forced to endure while incarcerated. She alleges specifically, that 1) she was required to drink and bathe in fluoridated water, despite her allergy to fluoride, causing her to suffer from rashes, hair loss, and other allergic reactions while incarcerated and should have been provided with bottled water to eliminate this problem; 2) she was housed in close proximity to cigarette smokers for 93 days, subjecting her to "constant discomfiture from breathing heavily polluted air and prolonged exposure to a known carcinogen, the long-term life threatening effects of which are not, as yet, fully discernable;" 3) she suffered from "abnormal uterine bleeding" for which she received no treatment; 4) she was not given an orthopedic mattress, which she required due to an arthritic condition; 5) she was not permitted to use a cane which she needed for walking during her incarceration; and 6) she was not given pain medication to alleviate the pain from which she suffers due to a condition called fibromyalgia, a form of arthritis.

Plaintiff's medical records from the prison include the following:

1) on her intake questionnaire, plaintiff listed the following medical problems: heart disease, arthritis and high blood pressure. Plaintiff also indicated on the questionnaire that she followed a special diet, the principal feature of which was a limit on her consumption of fried foods;

2) plaintiff also indicated on the questionnaire an allergy to fluoride and a history of gall bladder problems;

3) plaintiff did not list any other medical problems or conditions on her questionnaire (Record document no. 11, exhibit "A");

4) plaintiff complained about her low fat diet to the medical staff on February 16, 1993; and

5) Dr. Pagana, a prison physician, gave her permission to follow a regular diet.

### Regular care received

The prison infirmary records indicate that plaintiff was seen on a regular basis by prison medical staff. Plaintiff was seen by medical staff on: February 1, 5, 6, 7, 8, 9, 10, 11, 12, 16, 18, 19, 20, 21, 22, 25, and 26, and on March 1, 2, 3, and 4, 1993.

Our review of plaintiff's medical records for the entire period of her incarceration reveals that on every occasion in which she presented with a complaint, the validity of her complaint was assessed and appropriate steps taken or attempted to be taken.

### Care, treatment or cooperation refused on occasion

Certain omissions or failings which plaintiff now asserts resulted in her receiving substandard care were done at her own urging or were the result of her own refusal to cooperate with efforts to render medical assistance or advice to her.

Plaintiff submitted a written request to the prison nurse on February 10, 1993 asking that she be removed from dietary restrictions because such restrictions were not ordered by her physician. Plaintiff reiterated this request on February 11, 1993. (Record document no. 11, exhibits "D" and "E")

On some occasions, plaintiff refused the proffered treatment or care. In an "inmate request slip" dated February 18, 1993, plaintiff states that she "respectfully withdraws any permission ... for any treatment from the prison medical staff." (Record document no. 11, exhibit "D")

Notes of an infirmary visit on March 1, 1993 indicate that although plaintiff complained of a fluoride allergy, she refused to submit to a test for the same. (Record document no. 11, exhibit "B")

On March 2, 1993, plaintiff refused to have blood drawn for laboratory tests. The infirmary notes indicate that despite a member of staff engaging her in a "lengthy discussion" explaining why such tests were necessary and would be helpful in providing her with continuing care, plaintiff refused her consent and would not allow the tests to be done. (Record document no. 11, exhibit "B")

On March 3, 1993, plaintiff refused to use the nasal spray she was given because it was generic. Plaintiff stated by way of explanation that she could use only a particular name brand.

Although plaintiff complains of being compelled to drink fluoridated water and contends that this caused her to suffer an allergic reaction to fluoride, her medical records do not bear out her complaint. Plaintiff alleges that if exposed to fluoride, she develops hives. Only once during her incarceration did plaintiff report to the prison infirmary complaining of such a reaction. On March 3, 1993, plaintiff reported having one hive and a mouth sore. Plaintiff's claim was met with skepticism by the nurse on duty, who states in her notes that just prior to plaintiff's reporting these problems, she was observed by the nurse biting her lip and rubbing her skin. (Record document no. 11, exhibit "A")

Plaintiff's medical chart indicates that she was seen on at least two occasions by the medical staff regarding her complaints of an allergic reaction to fluoride in the water. Neither found any evidence of an allergic reaction to the same. (Record document no. 11, exhibit "B")

When plaintiff reported her alleged allergy to prison medical care providers, her claim was met with skepticism, based on their conviction that such an allergy is undocumented and unheard of in the medical community. Efforts were made, nevertheless, to find out whether plaintiff had such an allergy. Defendants consulted a specialist, Dr. Wasikewski, on the matter, who confirmed defendants' initial impression that any such reaction to fluoride was unknown in the medical community. (Record document no. 11, exhibit "C") Dr. Wasikewski further stated that the only way to confirm or negate the existence of such an allergy would be to have plaintiff ingest fluoride under medical supervision and then observe her for symptoms. Such a test was in fact performed by the prison medical staff.

On February 5, 1993, in a controlled "study", the prison physician on duty had her drink fluoridated water with some juice and then monitored her for an allergic reaction. No reaction was observed. In a further effort to get to the bottom of this alleged condition, the prison physician consulted with plaintiff's regular treating physician, Dr. Kim, and was advised by Dr. Kim that his records on plaintiffs showed no history of an allergic reaction to fluoride.

Defendants' considerable and diligent efforts to address plaintiff's multiple, almost daily medical problems and concerns unquestionably complied with Eighth Amendment standards as established by *Estelle* and its progeny. See, e.g., *Tulibacki* and *Price v. Kurtz,* 1995 WL 672377 (E.D.Pa. Nov. 13, 1995).

On that basis, their motion for summary judgment on plaintiff's Eighth Amendment claims for the denial of medical care will be granted.

**Second-hand smoke**

In *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the United States Supreme Court held that prison officials may violate the Eighth Amendment's prohibition against cruel and unusual punishments by exposing inmates to excessive levels of environmental tobacco smoke (ETS).

 To prove a constitutional violation, the prisoner must prove not only that

the level of ETS to which he is exposed is unreasonably high, but also that prison officials have shown "deliberate indifference" to the health risks associated with second-hand smoke. The existence or non-existence of a prison no-smoking policy factors into the court's inquiry into deliberate indifference. *Id.* See also: *Jordan v. New Jersey Department of Corrections,* 881 F.Supp. 947, 952 (D.N.J.1995).

■ The preconditions established by the Supreme Court for establishing an Eighth Amendment claim arising out of exposure to ETS have not been met here. Prison records reflect only one complaint by plaintiff about her alleged exposure to second-hand smoke. She states in an "inmate request slip" dated March 14, 1993 that her allergy to smoke is getting "quite bad," causing her to cough and "become increasingly congested." (Record document no. 11, exhibit "D") No other problems or difficulties with such exposure are noted in plaintiff's considerable medical record.

Plaintiff's single reported instance of congestion and coughing due to alleged ETS exposure is insufficient to trigger constitutional liability. Judgment will, therefore, be granted in defendants' favor on plaintiff's Eighth Amendment claim for exposure to ETS.

### ADA claims

■ Plaintiff asserts a claim under the ADA. The ADA was enacted to extend prohibitions against discrimination against the handicapped beyond the federal government and entities that receive federal funding. *Crowder v. True,* 1993 WL 532455 at * 5 (N.D.Ill. Dec. 21, 1993). Violation of the ADA can give rise to a section 1983 action. *Noland v. Wheatley,* 835 F.Supp. 476, 482–83 (N.D.Ind.1993).

The ADA provides that:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

■ To establish liability under this section, a plaintiff must prove that she: 1) has a disability; 2) was discriminated against on the basis of that disability; 3) was thereby denied goods or services; 4) by a place of public accommodation by the owner or operator of that facility. Adapted from *Torcasio v. Murray,* 862 F.Supp. 1482, 1491 (E.D.Va. 1994) (citing 42 U.S.C. § 12132), *aff'd in part, rev'd in part,* 57 F.3d 1340 (4th Cir.1995) (reversal based on Fourth Circuit's conclusion that prison officials sued were entitled to qualified immunity), *cert. denied,* —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1995).

Section 12131 defines a "public entity" to include any state or local government and any department, agency or special purpose district of a State or local government. 42 U.S.C. § 12131.

Although these definitions are, viewed in isolation, certainly broad enough to encompass Lycoming County and/or its prison board, at least one federal Circuit Court of Appeals has expressed grave concerns about an interpretation of this definition so expansive as to include state prisons and prison boards.

In *Torcasio,* 57 F.3d at 1342, the Fourth Circuit Court of Appeals examined the applicability of the ADA and Section 504 of the Rehabilitation Act of 1973 (Section 504 or the Rehabilitation Act), 29 U.S.C. § 794,[3] to the

---

**3.** Section 504 employs language virtually identical to that found in the ADA. Case law interpreting one is generally considered equally applicable to the other.

Section 504 provides:

No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a)

A "program or activity" is defined to include "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government." *29 U.S.C. § 794(b)(1)(A).*

officials of the Virginia Department of Corrections (VDOC) vis-a-vis inmate claims.

One source of the court's concern was the plain meaning of the definitions adopted by Congress. " 'Public Services'-connotes a ban on discrimination in services provided to the public, not in the prison context where the public is excluded." *Id.* at 1346 n. 5. "State prisons ... do not fit neatly within the definition of 'public entities' to which the ADA applies." *Id.*

A weightier concern was the impact which ruling the ADA applicable to state prisons would have on federal/state relations. In matters which affect the operation and management of state prisons, Acts of Congress should be deemed applicable only if there is a clear expression of congressional intent that the Act so apply. "[P]rinciples of comity and federalism apply with special force in the context of correctional facilities." *Id.* at 1346, citing *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973) and *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974).

If Congress intends to alter the "usual constitutional balance between the States and the Federal Government," that intention must be made "unmistakably clear in the language of the statute." *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). See also: *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991) This is nowhere more true than in matters affecting the operation of state prisons.

"[T]he management of state prisons is a core state function," the Fourth Circuit concluded in *Torcasio,* 57 F.3d at 1345. A "long line of Supreme Court precedent" supports the principle that "the management of state prisons is to be left to the states, as free as possible of federal interference." *Id.* at 1345–46.

The Fourth Circuit went on to find that requiring them to comply with the mandates of the ADA would undoubtedly have serious implications on the management and operation of state prisons, possibly mandating changes in everything from cell construction and assignments to the construction of stairs, elevators, ramps, beds, bathroom facilities, etc. *Id.* at 1346.

Based on these considerations, the Fourth Circuit concluded in *Torcasio,* in ruling on defendants' entitlement to qualified immunity from claims they had violated the ADA and the Rehabilitation Act, that it was not "clearly established" at the time of the alleged violations that those acts applied to state prisons. The defendants, were, therefore, entitled to dismissal of the claims against them on grounds of qualified immunity, the court ruled.

With few exceptions, the courts which have held that the ADA applies to inmates have reached that conclusion summarily and without engaging in an in-depth analysis of congressional intent. See, e.g., *Candelaria v. Coughlin,* 1994 WL 119146, at *7 (S.D.N.Y. April 11, 1994) and *Noland,* 835 F.Supp. at 482–83.

One such exception is the Ninth Circuit decision in *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988) in which the court ruled Section 504 applicable to prisons. Although *Bonner* has been cited and relied upon by other courts, See, e.g., *Donnell C. v. Illinois State Board of Education,* 829 F.Supp. 1016, 1020 (N.D.Ill.1993) and *Casey v. Lewis,* 834 F.Supp. 1569, 1583–85 (D.Ariz.1993) (no claim of non-applicability raised by defendants, but holding that plaintiffs failed to establish violations of Section 504)), the Ninth Circuit itself retreated from the *Bonner* holding in *Gates v. Rowland,* 39 F.3d 1439, 1446–47 (9th Cir.1994).

The Fourth Circuit's well-reasoned approach is, we conclude, the correct interpretation of ADA. The ADA should not be held applicable to facilities provided for prisoners in state prisons in the absence of a clear expression of congressional intent that that be the case, and we are not convinced that such intent has been expressed. See also: *Crowder,* slip op. at 5 (Neither Title II nor Title III of the ADA apply to the Federal Bureau of Prisons). The implication of this determination is that Little has no cause

of action under the ADA against Lycoming County, the prison board, or prison officials.

██ Even if we do not take the analysis that far, and consider only whether a right of inmates to protection under the ADA was "clearly established" at the time of plaintiff's alleged injury, i.e. in February through May, 1993, plaintiff's ADA claim still fails. As our discussion of the holding in *Torcasio* and the cases relied upon and analyzed in that decision plainly establishes, no such right was "clearly established," the Fourth Circuit held, as late as the spring of 1994. *Id.* at 1342.

██ State officials are entitled to qualified immunity from liability even if their conduct violated federal constitutional or statutory standards if the rights in question were not "clearly established" as of the time of the alleged violation and would have been known by a "reasonable person." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396. See also *Torcasio,* 57 F.3d at 1343. Defendants are, therefore, entitled to qualified immunity from the claims asserted by Little under the ADA.

██ Finally, even if we were to side with the decisions which have found the ADA applicable to state prisons, plaintiff still could not prevail under the facts of record. A "disability" is defined under the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Although neither "substantially limits" nor "major life activities" is defined in the statute, the Equal Employment Opportunity Commission (EEOC) has promulgated regulations which offer guidance. See 29 C.F.R. §§ 1630.2(i), (j)(1) (1994); see also 29 C.F.R. § 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act.

Plaintiff alleges that she was discriminated against on the basis of a disability which she alleges stems from injuries sustained in a 1990 automobile accident. The records of plaintiff's treating physician, Dr. Richard K. Straley, indicate that she was injured in an automobile accident on November 16, 1990. His records further indicate that plaintiff had recovered from the injuries sustained in that accident by March, 1991 and was released from his care to return to work on March 15, 1991. (Record document no. 11, exhibit "E") As her medical records while she was incarcerated reflect, plaintiff repeatedly sought medical treatment and reported to the infirmary on almost a daily basis throughout much of her period of incarceration. Despite her history of not suffering in silence, plaintiff complained of recurring knee arthritic problems on only one occasion.

Plaintiff had a prescription from I.G. Kim, M.D. for Darvocet for her knee and back pain. In an "inmate request slip" dated February 17, 1993 plaintiff requests that she continue receiving Darvocet PRN as prescribed by Dr. Kim for her arthritic and knee conditions. Plaintiff states that she has been experiencing severe pain. In response to plaintiff's request, Dr. Kim was contacted and advised the prison staff over the telephone to discontinue plaintiff's Darvocet. This conversation took place on February 18, 1993 and is noted on plaintiff's request slip.

There is also a reference in plaintiff's medical history to an injury to her right ankle allegedly sustained on February 15, 1991 when plaintiff was taken into custody by the Lycoming County Sheriff's department. Plaintiff consulted Dr. Kim regarding this injury, received treatment, and was declared by him on March 15, 1991, to be substantially recovered from the same. Dr. Kim notes in his treatment progress notes that, although plaintiff should avoid any job requiring her to repeatedly ascend and descend a step ladder or engage in repetitive stooping and squatting, she is subject to no other limitations.

The only other reference in plaintiff's medical record to her alleged knee and arthritic problems appears in a recitation of problems and complaints *apparently* made by plaintiff to the medical staff. That recitation includes a notation that plaintiff is in need of a left "total knee replacement."

A healed knee injury which sometimes causes recurring discomfort does not render plaintiff "disabled" for ADA purposes. Com-

pare: 29 C.F.R. § 1630.2(i) ("Major life activities means functions such as ... walking....").

■ We are not convinced that Little's alleged impairment is "substantial" within the meaning of the ADA. "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." 29 C.F.R. pt. 1630 App., § 1630.2(j). "[N]ot every impairment that affected an individual's major life activities is a substantially limiting impairment." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446 (7th Cir.1995), citing *Hamm v. Runyon*, 51 F.3d 721, 726 (7th Cir.1995) (" 'Many impairments do not impact an individual's life to the degree that they constitute disabling impairments.' " (quoting 29 C.F.R. pt. 1630 App., § 1630.2(j))).[4]

In *Evans v. City of Dallas*, 861 F.2d 846, 852–53 (5th Cir.1988), for example, the plaintiff was discharged after excessive absenteeism attributable to a knee injury that required surgery. The court held that plaintiff was not "disabled" within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, since that Act contemplates an impairment of a more permanent nature. *Id.* at 853.

Hence, we conclude that under applicable ADA standards, none of plaintiff's claims triggers ADA liability on the part of the defendants.

Even if we were to find that plaintiff has established a disability under ADA standards, prison records do not reflect any receipt of complaints from her about difficulty in using the stairs. Nor do they reflect any differing or discriminatory conditions inflicted upon plaintiff because of her alleged disability. The only deficiency specific to her which plaintiff identifies as an alleged ADA violation was alleged restrictions placed on her use of exercise time. Prison records indicate that plaintiff was restricted from gym activity due to the history of knee and heart problems. The restriction was imposed for plaintiff's benefit and does not establish an ADA violation.

**Respondeat superior**

■ Plaintiff's claims against Warden Desmond and the hospital are subject to summary judgment on another ground as well. Plaintiff has not alleged any personal involvement on their part in any of the activities alleged to have resulted in a violation of her constitutional rights.

■ A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir.1990). *Respondeat superior* is not a basis for a claim asserted under section 1983 or related statutes. A defendant cannot be held liable under section 1983 unless he caused or participated in an alleged violation of constitutional rights. Section 1983 claims cannot be based on respondeat superior. *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.1986). The plaintiff must establish a "causal connection, or an affirmative link, between the misconduct complained of and the official sued." *Campbell v. Lane*, 1990 WL 171598 (E.D.Ill. Oct. 25, 1990), citing *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). See also: *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir.1981) (Plaintiff could not recover against prison warden for alleged eighth amendment violations, since it was unlikely that he participated in day-to-day decisions leading to the alleged delay in plaintiff's receiving treatment) and *Ford v. Lane*, 714 F.Supp. 310, 315–16 (N.D.Ill.1989) (Prison warden and director of Department of Corrections could not be held responsible, based on their supervisory positions, for medical care alleged to be inadequate).

No such connection exists here with respect to the claims asserted against the warden and the hospital. See, e.g., *Freed v. Horn*, 1995 WL 710529 at *3–4 (E.D.Pa. Dec. 1, 1995).

---

4. Since the definition of "disability" is substantially equivalent under both the ADA and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797 (1988 & Supp.1995), this court will, as other courts have, look to the case law from both in analyzing plaintiff's alleged disability status. See *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 n. 4, 14 (5th Cir.1995).

**Monell claims**

 Plaintiff asserts a *Monell* claim against Lycoming County. Under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a governmental entity cannot be held liable under Section 1983 unless it caused or participated in an alleged violation of constitutional rights.

> Respondeat superior or vicarious liability will not attach under § 1983.... 'It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983.'

*City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), quoting *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119–20, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting). See also: *Simmons v. City of Philadelphia*, 947 F.2d 1042 (3d Cir.1991) and *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990).

 Allegations or evidence of a "single incident of unconstitutional activity" are not sufficient to impose liability unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy. *Tapia v. City of Greenwood*, 965 F.2d 336, 339–40 (7th Cir.1992), relying on *City of Canton.*

Plaintiff cannot prevail against the County or the prison board under these standards. There is no evidence of any policy, *de facto* or otherwise, which operated to deny her medical care in violation of the Eighth Amendment. The record, in fact, indicates the opposite: that structures and policies were in place to allow plaintiff to report any medical problem or difficulty she was experiencing and to receive an appropriate response to the concerns or problems which she raised.